# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **HANDEL'S ENTERPRISES, INC.,** | **CASE NO. 4:18-CV-00508** |
| **Plaintiff,** | **(CONSOLIDATED WITH** |
| **-vs-** | **CASE NO. 4:18-CV-02094)** |
| | **JUDGE PAMELA A. BARKER** |
| **KENNETH S. SCHULENBURG, et al.,** | |
| **Defendants.** | **MEMORANDUM OF OPINION AND ORDER** |

This matter comes before the Court upon the Emergency Renewed Motion for Preliminary Injunction ("Motion") of Plaintiff Handel's Enterprises, Inc. ("Handel's"). (Doc. No. 99.) Defendants Kenneth Schulenburg ("Schulenburg"), Juliana Ortiz ("Ortiz"), and Moonlight101, Inc. ("Moonlight101") (collectively, "Defendants") filed a brief in opposition on January 15, 2020, to which Handel's replied on January 20, 2020. (Doc. Nos. 100, 101.) The Court also granted Defendants leave to file a sur-reply, which Defendants filed on January 21, 2020. (Doc. No. 102.)

For the following reasons, Handel's Emergency Renewed Motion for Preliminary Injunction (Doc. No. 99) is GRANTED.

## I. Background[1]

Handel's is a nationwide franchisor and operator of ice cream parlors, with forty-seven locations in nine states. (Doc. No. 68 at ¶¶ 1, 5.) In October 2015, Schulenburg met with Handel's to discuss the possibility of purchasing a Handel's franchise in the San Diego, California area. (*Id.*

---

[1] This case has an extensive factual and procedural history with which the parties are familiar. The Court will describe that history only to the extent it is relevant to Handel's Motion.

at ¶ 28.)  Several months later, on January 21, 2016, Handel's and Schulenburg executed a Franchise

Agreement.  (Doc. No. 67 at ¶¶ 10-11.)  Schulenburg is the President of Moonlight101, which he

specifically incorporated in order to operate the franchised ice cream store that he bought from

Handel's.  (Doc. No. 26-1 at ¶ 3; Doc. No. 69 at ¶ 3.)  Handel's asserts that Ortiz is also a principal

of Moonlight101, while Defendants contend Ortiz is simply an employee of Moonlight101.  (Doc.

No. 26-2 at ¶ 3; Doc. No. 68 at ¶ 17.)

The Franchise Agreement assigned Schulenburg a "three-mile radius surrounding the Lofts at

Moonlight Beach" in Encinitas, California.  (Doc. No. 67-7 at 113.)  It also contemplated the grant

of a second franchise location in the Gaslamp Quarter of downtown San Diego and provided

Schulenburg a right of first refusal in that area for a period of two years after the execution of the

Franchise Agreement.  (*Id.*)  The initial term of the agreement was for five years, beginning January

22, 2016 and ending January 22, 2021.  (*Id.* at 82.)  As such, Schulenburg is still a Handel's

franchisee.  (Doc. No. 99-2 at 28:3-15.)

With regard to Handel's trade secrets and confidential information, the Franchise Agreement

provides the following:

> You acknowledge and agree that your total knowledge of the System, and
> construction, operation and promotion of the Ice Cream Parlor, is derived from
> information we disclosed to you under this Agreement, Handel's Manuals and
> otherwise, and that such information is proprietary, confidential and a trade secret of
> Handel's.  You, as franchisee and principal, jointly and severally covenant and agree
> that you will maintain the absolute confidentiality of all such information during and
> after the term of this Agreement, and not use this information in any other business or
> manner unless approved in writing by Handel's.

(Doc. No. 67-7 at 87.)  A separate provision also requires Schulenburg to keep confidential the

contents of Handel's "Confidential Operations Manual," which contains the "specifications,

standards and procedures" for operating a Handel's franchise.  (*Id.* at 85.)  In addition, this same

provision requires Schulenburg to have his "employees sign a written nondisclosure covenant . . . before disclosing any contents of the Manuals to them." (*Id.*) Handel's also had Ortiz sign a written confidentiality agreement. (*See* Doc. No. 99-3.)

The Franchise Agreement also includes two non-compete provisions—one that applies during the term of the agreement and one that applies after termination. Section 5.07 of the Franchise Agreement contains the in-term covenant not to compete. (Doc. No. 67-7 at 86.) It provides that, during the initial term of the agreement, Schulenburg would not "directly, indirectly, or in any matter whatever, be involved with any business which is competitive with, or similar to [Handel's], in any way." (*Id.*) The post-contract covenant not to compete precludes Schulenburg from being involved in the sale of ice cream and related products and services for a period of two years after termination of the agreement in "the Territory" or "within 2 miles of any Handel's franchised or company-owned store." (*Id.* at 91.)

As part of the operation of a Handel's franchise, Schulenburg and Ortiz received the following documentation: (1) Handel's Recipe Guide, which includes ingredient lists and preparation methods for Handel's ice cream (Doc. No. 99-4); (2) Handel's Confidential Operations Manual (Doc. No. 26-1 at ¶ 9); and (3) Handel's Preparation Guide, which includes instructions on the preparation of every Handel's menu item, including the correct ice cream scoopers to use to make the "Perfect Cone" (Doc. Nos. 91-3, 91-4). Schulenburg and Ortiz also attended Handel's franchise training. (Doc. No. 26-1 at ¶ 8; Doc. No. 26-2 at ¶ 4.) Neither Schulenburg nor Ortiz had any prior experience in the ice cream industry. (Doc. No. 26-1 at ¶ 15; Doc. No. 26-2 at ¶ 6.)

In mid-2017, about a year and a half after Schulenburg executed the Franchise Agreement and opened his franchise in Encinitas, California (the "Encinitas Franchise"), Schulenburg began to

discuss the development of his second Handel's location in the Gaslamp Quarter of downtown San Diego, and chose a location at 425 Market Street, San Diego, California. (Doc. No. 68 at ¶ 100.) According to Handel's, Schulenburg refused to provide Handel's with a copy of the final lease for the Gaslamp Quarter location or pay the franchise fee. (*Id.* at ¶¶ 107-08.) Despite negotiations regarding terminating or restructuring the franchise relationship, the parties could not resolve their disagreements and litigation ensued.

On March 5, 2018, Handel's filed suit against Schulenburg, Ortiz, and Moonlight101 in this Court, asserting claims for trademark infringement, trademark dilution, false designation of origin, unfair competition, breach of contract, misappropriation of trade secrets, fraud, fraudulent concealment, conversion, declaratory judgment, and tortious interference. (Doc. No. 1.) Handel's also contemporaneously sought a preliminary injunction to prevent Schulenburg from operating an ice cream parlor at 425 Market Street, San Diego, California, which Handel's claimed would be in breach of the Franchise Agreement's covenants not to compete and would improperly use Handel's proprietary, confidential, and trade secret information. (Doc. No. 3.)

The previous judge assigned to this case, Judge Benita Pearson, held a hearing on Handel's Motion for Preliminary Injunction on May 9, 2018. At the hearing, Schulenburg's counsel informed Judge Pearson that Schulenburg had opened an independent ice cream store in the Gaslamp Quarter at 425 Market Street—Cali Cream Homemade Ice Cream ("Cali Cream")—and that it had opened after the filing of Handel's lawsuit and Motion for Preliminary Injunction. (Doc. No. 48 at 43.) On June 22, 2018, Judge Pearson granted Handel's Motion for Preliminary Injunction, finding that Handel's had a strong likelihood of success on both its trade secret and non-compete claims. (Doc. No. 42.) Consequently, Judge Pearson enjoined Schulenburg from operating any business

competitive with or similar to Handel's, specifically including Cali Cream, until Schulenburg's status as a Handel's franchisee had been resolved, but no longer than January 22, 2020. (Doc. No. 43 at 3-4.) Handel's had proposed that the injunction remain in effect "no longer than the term of the parties' franchise relationship, which expires January 22, 2021." (Doc. No. 37 at 4.) But Judge Pearson limited it to January 22, 2020, noting that Handel's "suggested that the Order remain in effect until January 22, 2021 without adequate explanation." (Doc. No. 43 at 4 n.1.) The Sixth Circuit affirmed Judge Pearson's decision on appeal. *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117 (6th Cir. 2019).

During the short time it was in operation, Cali Cream offered many flavors similar to those offered by Handel's. (*See* Guizar Dep. at 54:1-65:4; Guizar Dep. Exs. JJ and SSS.)[2] For example, Cali Cream flavors included Blueberry Cheesecake (compared to Handel's Blueberry Cheesecake Chunk), Cookie Monster (compared to Handel's Blue Monster), Dat Brownie Dough (compared to Handel's Brownie Dough), and Matcha Green Tea (compared to Handel's Green Tea). (Guizar Dep. Exs. JJ and SSS.) The methods of preparation for many of these flavors are also very similar. (*See* Guizar Dep. at 54:1-65:4; Guizar Dep. Exs. JJ and SSS.) Cali Cream also used some of the same suppliers, many of the same ingredients, the same dipping cabinets, and employed Alan Guizar ("Guizar")—who is also the ice cream maker for the Encinitas Franchise—to make ice cream. (Doc. No. 99-2 at 228:24-229:4, 244:10-14, 248:19-258:11; Doc. No. 99-5 at 309:1-22; Doc. No. 99-6 at 12:21-13:23, 22:21-23:5.) Handel's additionally points to the fact that Cali Cream used the same cocoa powder as Handel's despite numerous varieties on the market. (Doc. No. 99-2 at 255:17-

---

[2] The referenced portion of Guizar's deposition testimony and corresponding exhibits were marked "attorneys' eyes only" and submitted to the Court for in-camera review on January 17, 2020.

257:6.)  Several news articles and websites also noted similarities between Handel's and Cali Cream. (*See* Doc. No. 101 at 4 n.1.)

However, there is also evidence that Cali Cream used many different suppliers, different ice-cream making equipment, a different ice cream base mix, different recipes, and many different ingredients.  (Doc. No. 100-3 at ¶¶ 6-13.)  Schulenburg has indicated that he developed Cali Cream's recipes by searching online, experimenting with ingredients at Cali Cream, and getting suggestions from others in the industry, and that neither he nor anyone else at Cali Cream used or relied in any way on any Handel's manuals, recipes, or guides.  (*Id.* at ¶¶ 12, 14.)

On November 6, 2019, Defendants moved to dissolve the preliminary injunction issued by Judge Pearson, claiming that evidence developed during discovery demonstrated the preliminary injunction had been improvidently granted.  (Doc. No. 85.)  Shortly thereafter, on November 12, 2019, Handel's moved to correct the expiration date of the preliminary injunction.  (Doc. No. 87.) Handel's argued that the preliminary injunction—which was set to expire on January 22, 2020— should be extended to January 22, 2021 in order to align the injunction with the expiration of the initial term of the Franchise Agreement.  On January 6, 2020, the Court denied both parties' motions. (Doc. No. 97.)  The Court found that Defendants had failed to establish any changes in the facts, the law, or circumstances that warranted dissolving the preliminary injunction.  (*Id.* at 16-20.)  The Court also found that Handel's request to extend the preliminary injunction failed to adequately address the four factors courts not only consider when issuing a preliminary injunction, but when extending one. However, the Court noted that the denial was without prejudice to Handel's bringing a properly supported motion.  (*Id.* at 20-24.)

On January 9, 2020, Handel's filed its Emergency Renewed Motion for Preliminary Injunction, seeking to address the deficiency in its earlier motion by addressing all four of the preliminary injunction factors. (Doc. No. 99.) Handel's once again requests that the Court issue a preliminary injunction that extends to January 22, 2021. In response, Defendants assert that Handel's has failed to present sufficient evidence to warrant extending the preliminary injunction such that its Motion should be denied outright, or, in the alternative, that the Court should hold an evidentiary hearing to address disputed issues of fact before ruling on Handel's Motion. (Doc. No. 100.)

The preliminary injunction entered by Judge Pearson expired on January 22, 2020. Having reviewed the evidence and briefs submitted by the parties, the Court concludes that the issuance of a new preliminary injunction is warranted.

## II. Evidentiary Hearing

Initially, the Court notes that an evidentiary hearing is unnecessary. When considering whether to grant a preliminary injunction, "a hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007). The Sixth Circuit summarized the rule as follows: "[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. [However,] where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing." *Id.* at 553 (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998)). The Court finds that while certain facts may be in dispute, those facts are not material to the preliminary injunction sought. Moreover, Judge Pearson previously conducted a hearing, the parties have had ample opportunity to

conduct discovery since then, and the relevant issues have been briefed numerous times. As such, the Court finds a hearing unnecessary.

## III. Standard of Review

"In general, courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 539-40 (6th Cir. 2017). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). In addition, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. "The party seeking the injunction must establish its case by clear and convincing evidence." *Draudt v. Wooster City Sch. Dist. Bd. of Educ.*, 246 F. Supp. 2d 820, 825 (N.D. Ohio 2003).

## IV. Analysis

### a. Likelihood of Success on the Merits

First, the Court considers whether Handel's "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration*, 511 F.3d at 543 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v.*

*Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* Handel's asserts it has shown a strong likelihood of success with regard to both its trade secret and non-compete claims. (Doc. No. 99-1 at 9-12.)

### i. Misappropriation of Trade Secrets

In Ohio, to prevail on a misappropriation of trade secrets claim, a plaintiff must show "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008).[3] Defendants contend that Handel's has failed to establish the first and third elements—the existence of a trade secret and unauthorized use. (Doc. No. 100 at 3-7.) The third element—Defendants' acquisition of any alleged trade secrets as a result of a confidential relationship with Handel's—is not disputed.

Based on the law-of-the-case doctrine, Handel's asserts this Court should not reconsider Judge Pearson and the Sixth Circuit's previous holdings with regard to Handel's trade secrets. (Doc. No. 101 at 8-10.) However, those findings are not necessarily binding in subsequent proceedings because holdings related to preliminary injunctions typically are based "on incomplete evidence and a relatively hurried consideration of the issues." *Vittitow v. City of Upper Arlington*, 43 F.3d 1100,

---

[3] With regard to Handel's trade secrets claim, Defendants urge this Court to reject application of the inevitable disclosure doctrine since California law does not recognize it. (Doc. No. 100 at 6.) However, in all other aspects of their analysis of Handel's trade secrets claim, Defendants themselves apply Ohio law. (*See id.* at 3-7.) In addition, Defendants fail to present any argument as to why California law should apply to Handel's trade secrets claim. All of their analysis on the choice of law issue relates solely to the application of California law to the covenants not to compete in the Franchise Agreement. (*Id.* at 7-8.) Accordingly, the Court will apply Ohio law to Handel's trade secrets claim, which is consistent with the treatment of Handel's trade secrets claim throughout this case.

1108 (6th Cir. 1995) (quoting *Brown v. Int'l Bhd. of Elec. Workers, Local Union No. 58 AFL–CIO*, 936 F.2d 251, 256 (6th Cir. 1991)); *see also Burks v. O'Connor, Kenny Partners, Inc.*, 77 F. App'x 351, 355 n.3 (6th Cir. 2003) ("Factual determinations in an interlocutory appeal will generally not establish the law of the case.") (citation omitted). A significant amount of discovery has occurred since the original preliminary injunction in this case was issued. Thus, the Court finds it appropriate to examine these issues anew.

## 1. Existence of a Trade Secret

Under the Ohio Uniform Trade Secrets Act ("OUTSA"), "[a] trade secret is information that derives independent economic value, actual or potential, from not being generally known to or ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts reasonable under the circumstances to maintain its secrecy." *MP TotalCare Services, Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 965 (N.D. Ohio 2009) (citing O.R.C. § 1333.61(D)). Courts consider six factors to determine whether an item constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524-25 (1997). Although the Supreme Court of Ohio "has never found one factor dispositive, it has emphasized that '[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status.'" *Heartland*, 258 F. App'x at 862 (quoting *State ex rel. Plain Dealer*, 80 Ohio St.3d at 525).

As part of the franchise relationship, Handel's asserts it provided Schulenburg and Ortiz with detailed documentation of Handel's trade secrets, including: (1) Handel's Recipe Guide, which includes ingredient lists and preparation methods for Handel's ice cream (Doc. No. 99-4); (2) Handel's Confidential Operations Manual, which includes "specifications, standards, and procedures" for operating a Handel's franchise (Doc. No. 68 at ¶ 41); and (3) Handel's Preparation Guide, which includes instructions on the preparation of every Handel's menu item (Doc. Nos. 91-3, 91-4).

With regard to Handel's Operations Manual, Defendants assert that discovery has demonstrated that the information contained therein does not qualify as a trade secret. (Doc. No. 100 at 4.) Defendants contend the Operations Manual is filled with boilerplate sections that are generic in nature. For example, at his deposition, Handel's Chief Operating Officer, Jim Brown ("Brown"), admitted that the Operations Manual contains sections on sanitation and emergency evacuation that are not exclusive to Handel's. (Doc. No. 100-1 at 110:10-16, 111:12-17.) Handel's asserts the Operations Manual contains the specifications, standards, and procedures for operating a Handel's franchise, but has not submitted any evidence to support this claim, to identify any of the specific information contained in the Operations Manual, or to explain why such information qualifies as a trade secret. As such, the Court finds Handel's has not met its burden at this stage to demonstrate that the information in its Operations Manual qualifies as a trade secret under the OUTSA.

However, the Court finds Handel's has shown that, with one exception discussed below, the information contained in Handel's Recipe and Preparation Guides qualifies as a trade secret. The information contained in these manuals is not known outside the business, was heavily restricted with confidentiality agreements, and developed over years of Handel's operating. Defendants cite *MP*

*TotalCare Services* for their argument that since Handel's executives disclosed some of Handel's recipes to Guizar during training without having him sign a confidentiality agreement, even though he was not yet an employee and had no obligation to protect its confidentiality, Handel's Recipe and Preparation Guides do not qualify as trade secrets. (Doc. No. 100 at 4.) However, the Court finds that case distinguishable from the instant matter. In *MP TotalCare Services*, the plaintiff publicly disclosed the alleged trade secret at an industry conference. 648 F. Supp. 2d at 966-67. Here, at most, Handel's made a single disclosure to a prospective employee of Defendants while Handel's executives were helping Defendants with the opening of the Encinitas Franchise. (Doc. No. 100-2 at 83:12-84:11, 94:9-25.) In addition, Guizar subsequently became an employee and should have been restricted from disclosing any confidential information, but Defendants themselves failed to have Guizar sign the required confidentiality agreement. (*See* Doc. No. 101-3 at 14:9-12; Doc. No. 67-7 at 85 ("You agree to have your employees sign a written non-disclosure covenant . . . before disclosing any contents of the Manuals to them.").) Moreover, there is no evidence that Handel's executives disclosed to Guizar all of Handel's recipes or preparation methods set forth in the Recipe and Preparation Guides such that the entirety of the information in the guides would lose its status as a trade secret. Thus, despite this minimal disclosure, there is still a substantial likelihood that Handel's will be able to establish the existence of a trade secret.

Defendants also argue that Handel's scooping methods and the shape of the scooped ice cream can be seen by any member of the public and cannot constitute trade secrets. (Doc. No. 100 at 4.) The Court agrees, and to the extent that such information is contained in Handel's Recipe Guide or Preparation Guide, it is not protectable as a trade secret.

### 2. Unauthorized Use of a Trade Secret

Under the OUTSA, "[a]ctual or threatened misappropriation may be enjoined." O.R.C. § 1333.62(A). "[A] threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 1st Dist. 2000). Known as the inevitable disclosure doctrine, "[t]his rule has been justified because the courts have recognized that it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so." *FirstEnergy Solutions Corp. v. Flerick*, No. 5:12–CV–2948, 2012 WL 6649201, at *5 (N.D. Ohio Dec. 20, 2012) (citations and internal quotations omitted). The doctrine is typically applied "when a former employee begins work with a competitor while the noncompetition clause has not expired." *Id.* (quoting *Hydrofarm v. Orendorff*, 905 N.E.2d 658, 663 (Ohio Ct. App. 10th Dist. 2008)).

Here, the parties dispute whether there is any evidence of actual misappropriation of Handel's trade secrets by Defendants. Handel's points to a variety of circumstantial evidence of misappropriation, including the fact that Cali Cream offered many of the same flavors offered by Schulenburg's Encinitas Franchise under the exact same or similar names. For example, Cali Cream flavors included Blueberry Cheesecake (compared to Handel's Blueberry Cheesecake Chunk), Cookie Monster (compared to Handel's Blue Monster), Dat Brownie Dough (compared to Handel's Brownie Dough), and Matcha Green Tea (compared to Handel's Green Tea). (Guizar Dep. at 54:1-65:4; Guizar Dep. Exs. JJ and SSS.) The methods of preparation for many of these flavors also appear

to be very similar. (*See id.*) In addition, Cali Cream used several of the same ingredients as Handel's despite numerous varieties in the market. (Doc. No. 99-2 at 255:17-257:6.) While the individual ingredients may not be proprietary, Handel's argues this is further evidence of Defendants' use of Handel's trade secrets in the operation of Cali Cream, as Defendants only knew of such ingredients because of their operation of the Encinitas Franchise. Moreover, Cali Cream employed Guizar—who is also the ice cream maker for the Encinitas Franchise—to make ice cream. (*Id.* at 228:24-229:4; Doc. No. 99-6 at 12:21-13:23, 22:21-23:5.)

In contrast, Defendants assert that Cali Cream used many different suppliers, different ice-cream making equipment, a different ice cream base mix, different recipes, and many different ingredients. (Doc. No. 100-3 at ¶¶ 6-13.) In addition, Schulenburg contends he developed Cali Cream's recipes by searching online, experimenting with ingredients at Cali Cream, and getting suggestions from other companies in the industry, and that neither he nor anyone else at Cali Cream used or relied in any way on any Handel's manuals, recipes, or guides. (*Id.* at ¶¶ 12, 14.)

The Court finds that a threatened misappropriation of trade secrets is still present in this case. It is undisputed that Defendants still have access to Handel's trade secrets in Handel's Recipe and Preparation Guides and now seek to operate a competing ice cream store in which they would have substantially the same positions they still hold at the Encinitas Franchise. Under the inevitable disclosure doctrine, this is sufficient to establish a threat of misappropriation warranting injunctive relief. The Court agrees with Handel's that it is unlikely that Defendants can disentangle the knowledge of Handel's trade secrets from their operation of Cali Cream, "no matter how well intentioned the effort may be to do so." *Flerick*, 2012 WL 6649201, at *5 (citation omitted). This is especially true given that Schulenburg and Ortiz had no previous experience in the ice cream industry

14

prior to becoming Handel's franchisees. (Doc. No. 26-1 at ¶ 15; Doc. No. 26-2 at ¶ 6.) Moreover, Handel's has produced a variety of circumstantial evidence that further supports a threat of misappropriation were Cali Cream to reopen.

Defendants cite several Ohio cases for the proposition that Handel's cannot rely on speculation and the inevitable disclosure doctrine to establish a threat of misappropriation, but they are distinguishable from the present situation. *See Hydrofarm, Inc.*, 905 N.E.2d at 665 (finding defendant did not "possess[] timely, sensitive, strategic, and/or technical information that, if it was proved, posed a serious threat to his former employer's business or a specific segment thereof"); *A&P Technology, Inc. v. Lariviere*, No. 1:17-cv-534, 2017 WL 6606961, at *6 (S.D. Ohio Dec. 27, 2017) (finding inevitable disclosure doctrine inapplicable where employee "waited out his two year noncompete before moving to another employer in the industry"). Accordingly, the Court finds Handel's has shown a substantial likelihood of success on the merits of its trade secrets claim.

### ii. Breach of the Franchise Agreement's Non-Compete Provisions

With respect to Handel's claim that Defendants have breached the Franchise Agreement's covenants not to compete, the parties initially dispute whether Ohio or California law governs and whether those provisions are enforceable. Based on a California State Addendum in the Franchise Agreement and certain statements by Brown at his deposition, Defendants assert that California law applies even though the Franchise Agreement contains a choice of law provision calling for the application of Ohio law. (Doc. No. 100 at 7-8.) Defendants assert the non-compete provisions are unenforceable under California law. (*Id.*) In the alternative, even if Ohio law is applicable, Defendants contend the non-compete provisions are unenforceable under Ohio law. (*Id.* at 8-9.) In response, Handel's asserts that this Court has already determined that Ohio law applies and that

regardless of which state's law applies, the non-compete provisions are enforceable. (Doc. No. 101 at 11.) Neither party conducted a choice of law analysis under Ohio's choice of law rules. *See In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 627 F. Supp. 2d 786, 793 (N.D. Ohio 2009) ("In deciding conflict of law questions in diversity of citizenship cases, a federal court generally follows the choice of law rules of the state in which it sits."). Nonetheless, the Court finds this analysis unnecessary because the Court agrees with Handel's that the Franchise Agreement's non-compete provisions are enforceable under either Ohio or California law.

Under Ohio law, "reasonable non-competition agreements are enforceable and those that are unreasonable are enforceable to the extent necessary to protect the employer's legitimate business interests." *Convergys Corp. v. Wellman*, No. 1:07-CV-509, 2007 WL 4248202, at *6 (S.D. Ohio Nov. 30, 2007). A non-competition agreement "is reasonable if it is no greater than required for the protection of the employer, does not impose an undue hardship on the employee, and is not injurious to the public." *Id.*

Applying these principles, both Judge Pearson and the Sixth Circuit, on appeal, found that the non-compete provisions in the Franchise Agreement were enforceable under Ohio law. As noted above, Defendants argue that these findings are not binding as the law of the case because they were based on an incomplete evidentiary record. (*See* Doc. No. 100 at 12.) However, Defendants do not present any new legal arguments or evidence not considered in the earlier preliminary injunction decisions. Indeed, Defendants repeat the same argument presented to Judge Pearson and the Sixth Circuit that Section 5.07 of the Franchise Agreement is unenforceable because it contains no geographic limitation. (*Id.* at 8-9.) Judge Pearson and the Sixth Circuit explicitly considered the geographic scope of this provision and found it reasonable under Ohio law. *Handel's*, 765 F. Appx.

at 124 ("As for the spatial prohibition in Section 5.07, we agree with the district court that the geographic restrictions are reasonable."). Thus, even if these rulings are not binding as the law of the case, the Court finds their reasoning persuasive and likewise concludes that Section 5.07 is enforceable under Ohio law.

With respect to California law, California Business and Professions Code § 16600 provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." In the franchise context, "*post-termination* covenants not to compete are voided by Section 16600." *Sonoma Tires, Inc. v. Big O Tires, LLC*, No. C 11-0818 RS, 2013 WL 12173748, at *7 (N.D. Cal. Jan. 22, 2013) (emphasis added). However, "California courts support the position 'that preventing defendants from competing only during the term of [an] existing franchise agreement, would not be void'" under § 16600. *Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277, 1291 n.15 (9th Cir. 2009) (quoting *Great Frame Up Systems, Inc. v. Jazayeri Enterprises*, 789 F. Supp. 253, 255 (N.D. Ill. 1992)). "Such an in-term covenant will be upheld, as long as it does not 'foreclose competition in a substantial share of the affected line of commerce' or 'prevent a party from engaging in an entire profession, business or trade.'" *Sonoma Tires,* 2013 WL 12173748, at *8 (quoting *Comedy Club*, 553 F.3d at 1291).

For example, in *Sonoma Tires*, the court upheld a covenant not to "engage in or open any business, at any location, other than as a Franchisee of the Big O System, which offers or sells tires, wheels, automotive services, or other products or services which compete with Big O Products and Services" during the term of the franchise agreement. 2013 WL 12173748, at *2, *8. There, the franchisor brought suit against its franchisee for breaching the covenant by operating two independent

stores—Sonoma Tires and Mission Tires—while the franchise agreement was in place. *Id.* at *5. First, the Court found that the in-term covenant "would not 'foreclose competition in a substantial share of the affected line of commerce' because, as neither party disputes, there is ample competition in the retail tire industry and [the franchisee's] Sonoma Tires and Mission Tires stores do not comprise a 'substantial share' of that industry." *Id.* at *8. Second, the court reasoned that "given that the in-term covenant allowed [the franchisee] to operate a Big O franchise and open additional Big O franchises, it cannot be said that the practical effect of the covenant as written would be to prevent [the franchisee] 'from engaging in an entire profession, business or trade' during the duration of the franchise agreement." *Id.* at *8. Thus, the Court found that the in-term covenant not to compete was valid and enforceable under § 16600. *Id.*; *see also Great Frame Up*, 789 F. Supp. at 256 ("D.J. is not prevented from engaging in his entire profession because, even without his interest in Express Framing, he has the Irvine franchise as a profession."); *Keating v. Baskin-Robbins USA Co.*, No. 5:99–CV–148–BR(3), 2001 WL 407017, at *13 (E.D.N.C. Mar. 27, 2001) (interpreting § 16600; holding "[i]t is beyond cavil that an ice cream franchise may reasonably require a franchisee not to operate a competing ice cream store during the term of its franchise agreement").

As in *Sonoma Tires*, even though there is no geographic limitation on the Franchise Agreement's in-term non-compete provision, there is no evidence that the covenant would foreclose competition in a substantial share of the affected line of commerce, as there is no evidence that Cali Cream comprises a substantial share of the ice cream store industry. Moreover, because the in-term covenant allowed Schulenburg to operate a Handel's franchise and open additional Handel's franchises, it cannot be said that the practical effect of the covenant as written would be to prevent Schulenburg from engaging in an entire profession, business, or trade during the duration of the

Franchise Agreement. Consequently, the in-term covenant not to compete contained in the Franchise Agreement is valid under California law.[4]

Although the Court has found the provision is enforceable, this does not end the Court's inquiry, as Defendants contend it does not apply to their operation of Cali Cream regardless of whether it is enforceable. The Court disagrees. The in-term covenant not to compete prohibits Defendants from being "involved with any business which is competitive with, *or similar to [Handel's], in any way*." (Doc. No. 67-7 at 86 (emphasis added).) Handel's has submitted substantial evidence that Handel's and Cali Cream are similar and that the operation of Cali Cream would thus breach the Franchise Agreement. Most fundamentally, both Handel's and Cali Cream are homemade ice cream businesses. Cali Cream also offered similar flavors (Guizar Dep. at 54:1-65:4; Guizar Dep. Exs. JJ and SSS) and used many of the same ingredients (Doc. No. 99-2 at 247:18-258:11; Doc. No. 99-6 at 52:10-53:9). Moreover, news articles from the period in which Cali Cream was open demonstrate the apparent similarities between the two ice cream stores. Consequently, Handel's has shown a strong likelihood of success on the merits of its claim with respect to Defendants' breach of the Franchise Agreement's non-compete provisions. Accordingly, the first factor favors issuance of a renewed preliminary injunction.

### b. Irreparable Injury

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550. A plaintiff's injury is considered "irreparable if it is not fully

---

[4] Defendants' reliance on *Aussie Pet Mobile, Inc. v. Benton*, No. SACV 09-1407 AG (RNBx), 2010 WL 2629556 (C.D. Cal. June 28, 2010) is also misplaced, as the court in that case did not address the distinction between in-term and post-termination covenants not to compete.

compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

The Court finds that Handel's has made a strong showing that it will suffer irreparable injury if an injunction is not issued. As the Sixth Circuit found in affirming the original preliminary injunction entered in this case, based on evidence of the similarities between Handel's and Cali Cream, "the opening of Cali Cream created a strong risk of market confusion, along with the loss of fair competition and customer goodwill from existing and prospective customers." *Handel's*, 765 F. App'x at 125. Judge Pearson likewise found a strong risk of each of these harms. (*See* Doc. No. 42 at 12-13.) These types of harms are generally considered irreparable because the damages caused by them are difficult to calculate. *E.g.*, *Basicomputer*, 973 F.2d at 512 ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. . . . Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."). Defendants have not presented any evidence to indicate that the risk of these harms has diminished since the Sixth Circuit and Judge Pearson's earlier decisions. Moreover, Handel's failure to enforce its non-competition covenant would undermine its credibility with both its existing and future franchisees, further contributing to the risk that Handel's would suffer irreparable injury if the injunction is not extended. *See Petland, Inc. v. Hendrix*, No. 204CV224, 2004 WL 3406089, at *7 (S.D. Ohio Sept. 14, 2004) ("[F]ranchise relationships are put at risk by sending a message that restrictive covenants and non-compete agreements are of no effect."). Consequently, this factor weighs in favor of issuing a renewed preliminary injunction.

### c. Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others." *Flight Options*, 863 F.3d at 540. In this case, neither party has presented any evidence that enforcing the Franchise Agreement's non-compete provisions would cause any harm to third parties. To the extent that an extended injunction would continue to harm Defendants, that harm is self-inflicted and outweighed by the harm to Handel's discussed above. *See Dealer Specialties, Inc. v. Car Data 24/7, Inc.*, No. 1:15-cv-170, 2016 WL 5341797, at *8 (S.D. Ohio Sept. 23, 2016) ("While Defendants may argue that granting this relief would harm their business, Defendants may not benefit from their breach of contract."). Indeed, as Judge Pearson noted, "Defendants were well aware of the risks associated with opening a competing store, had prior notice of Handel's motion for preliminary injunction—seeking to enjoin Defendants from operating the competing business, yet, did so any way." (Doc. No. 42 at 14.) Thus, the third factor weighs in favor of granting the preliminary injunction as well.

### d. Public Interest

The fourth and final factor courts must consider when granting a preliminary injunction is "whether the public interest will be served by an injunction." *Flight Options*, 863 F.3d at 540. The Sixth Circuit has held that "[t]he public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) (quoting *Nat'l Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 891 (N.D. Ohio 1996)); *see also Certified Restoration*, 511 F.3d. at 551 ("Enforcement of contractual duties is in the public interest."). As such, the public interest will be served by an injunction, and this factor supports the grant of a renewed preliminary injunction.

### e. Unclean Hands

Finally, Defendants assert that Handel's unclean hands bars the grant of equitable relief. (Doc. No. 100 at 14-15.) "The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) (quoting *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 126 (M.D. Pa. 1992)). However, "the doctrine is to be applied 'only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" *Id.* (quoting *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989)). In other words, "the doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct." *Id.* (quoting *American Hosp. Supply Corp. v. Hosp. Products, Ltd.*, 780 F.2d 589, 601 (7th Cir.1986)). Further, "[t]he unclean-hands defense is not an automatic or absolute bar to relief; it is only one of the factors the court must consider when deciding whether to exercise its discretion and grant an injunction." *CJPS Healthcare Supplies & Equip. v. Ansar Med. Technologies, Inc.*, No. 12–CV–14885, 2013 WL 4502176, at *8 (E.D. Mich. Aug. 22, 2013) (citation omitted).

Defendants assert Handel's has unclean hands because it has been racing to beat them to the punch by opening Handel's franchises near the Encinitas Franchise in an effort to box them in economically and undermine the viability of the Encinitas Franchise. (Doc. No. 100 at 14.) According to Defendants, Handel's has used business plans and information that Schulenburg provided to Handel's in confidence based on Handel's representations to him that he would be the

only franchisee in San Diego County. (*Id.*)  Defendants allege that Handel's representations to him were false and that at the same time Handel's was making these representations to Schulenburg, it was actively negotiating with another group of investors to open franchises in San Diego County. (*Id.*)  Defendants contend it was this bad faith conduct that played a material role in creating the soured relations between the parties and led Mr. Schulenburg to seek rescission of the Franchise Agreement. (*Id.* at 14-15.)  Defendants assert Handel's conduct is a plain breach of the duty of good faith and fair dealing inherent in each contract and constitutes bad faith conduct sufficient to deny Handel's request for injunctive relief. (*Id.* at 15.)

Even accepting Defendants' allegations as true, the Court finds it unlikely that they will be able to establish that Handel's breached its duty of good faith and fair dealing. Ohio common law "imposes an implied duty of good faith in the performance of contracts." *Jacobs v. Dye Oil, LLC*, No. 18 MO 0020, 2019 WL 4898488, at *9 (Ohio Ct. App. 7th Dist. Sept. 30, 2019). The Ohio Supreme Court has described this duty as "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443-44 (1996) (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)). As such, "the duty is not imposed when a matter is specifically covered by the written terms of a contract." *Jacobs*, 2019 WL 4898488, at *9. "Instead, this duty is implied only under limited circumstances, such as when the contract is silent as to an issue." *Id.* Moreover, "Ohio law is crystal clear that an actor does not act in 'bad faith' when it decides to enforce its contractual rights." *Oak Rubber Co. v. Bank One, N.A.*, 214 F. Supp. 2d 820, 833 (N.D. Ohio 2002). Indeed,

"[a] party may even enforce its contractual rights to the 'great discomfort' of the other party without violating its duty of good faith." *Id.*

Here, the Franchise Agreement specifically delineated the territory provided to Schulenburg. The Franchise Agreement assigned Schulenburg a "three-mile radius surrounding the Lofts at Moonlight Beach" in Encinitas, California. (Doc. No. 67-7 at 113.) It also provided Schulenburg a right of first refusal for a franchise in the Gaslamp Quarter of downtown San Diego for a period of two years after the execution of the Franchise Agreement. (*Id.*) Thus, regardless of whether Handel's represented to Schulenburg that he would be the only franchisee in San Diego County, Handel's opening of additional franchises in San Diego County does not breach its duty of good faith because Schulenburg's territory was specifically covered by the written terms of the Franchise Agreement. *See McGrath v. Nationwide Mut. Ins. Co.*, 295 F. Supp. 3d 796, 808 (S.D. Ohio 2018) ("McGrath claims Nationwide lured her into participating in its agent programs through false promises regarding her ability to purchase the servicing rights to an existing book of policies. But her written agreements with Nationwide specifically spoke to her obligations to earn commissions through her generation of new policies, not through servicing existing policies. Therefore, there could be no implied covenants on this point for Nationwide to breach.") As a result, even assuming that Handel's made these false representations and used certain confidential information provided by Schulenburg in the opening of additional franchises, the fact remains that Schulenburg's right to be the exclusive franchisee in San Diego County was never a part of the Franchise Agreement. To the contrary, the Franchise Agreement specifically limited his territory to certain areas. Handel's opening of additional franchises in San Diego County does not intrude on Schulenburg's territory under the Franchise Agreement, and Handel's is entitled to enforce its rights even to the discomfort of Defendants. As

such, Handel's actions do not constitute a breach of the duty of good faith. Nor do they rise to the level of such unconscionable conduct as to preclude Handel's from obtaining injunctive relief to enforce the covenant not to compete contained in the Franchise Agreement, especially given that all four preliminary injunction factors weigh in favor of granting Handel's Motion.

**V.  Conclusion**

For the reasons set forth above, Handel's Emergency Renewed Motion for Preliminary Injunction (Doc. No. 99) is GRANTED. The Court will issue a separate order contemporaneous with this opinion providing for the terms of the preliminary injunction and requiring Handel's to post a bond.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date: January 27, 2020                    U. S. DISTRICT JUDGE